## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ANASTASIA P DIEHL, | |
| PLAINTIFF, | Case No.: |
| VS. | |
| PAYMAP, INC., | JURY TRIAL REQUESTED |
| DEFENDANT. | |

## COMPLAINT

COMES NOW the Plaintiff Anastasia P Diehl (hereafter the "Plaintiff") by counsel, and as Complaint against the above-named Defendant, and avers as follows:

### PRELIMINARY STATEMENT

This action arises from the Defendant's acts and omissions regarding Plaintiff's home mortgage loan payments which were electronically withdrawn from her account and directed to Defendant through the "Equity Accelerator Program" offered through Plaintiff's mortgage company. Plaintiff has learned that payments intended to be directed to her mortgage company were in fact retained by Defendant and/or directed to others and, in any event, were not directed to the proper entity in order to timely satisfy the mortgage obligations. As a result, Plaintiff's loan was considered in default even though, at all relevant times, funds adequate to timely satisfy her mortgage payments were deducted from her account. As a result of Defendant's wrongful acts and omissions, Plaintiff's credit was impaired, and she was subjected to a harassing, invasive and oppressive collection campaign which included hundreds of collection calls and threats of foreclosure. Plaintiff asserts various state law claims and seeks actual damages, including damages

for emotional distress and mental anguish, punitive damages and costs. This Court has jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000.00.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity).

2.      Venue is proper here because the events giving rise to Plaintiff's cause of action occurred in this District and venue is proper in this District pursuant to 28 U.S.C. § 1409.

## PARTIES

3.      The Plaintiff is a natural person and resident of Mobile County, Alabama. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

4.      Defendant Paymap, Inc., ("Paymap") is a corporation formed outside the state of Alabama with its principal place of business in Colorado. Paymap is a wholly owned subsidiary of The Western Union Company.

## FACTUAL ALLEGATIONS

5.      On or about April 15, 2014, Plaintiff entered into a loan agreement with Home Mortgage of America, Inc. in the amount of $140,409.00. The loan is secured by a mortgage on Plaintiff's home located at 9978 Peyton Drive North in Mobile, Alabama.

6.      Before her first mortgage payment was due, Plaintiff received written notice that her loan was being transferred to The Money Source Inc. ("TMS") and would be serviced by TMS and LoanCare, LLC ("LoanCare"), as subservicer.   In late 2014, Plaintiff asked LoanCare if it were possible to arrange for bi-monthly payments.  Plaintiff is paid every two weeks and she wanted to make an arrangement whereby half of the monthly payment would be automatically deducted from each paycheck.  She was simply seeking a more convenient payment arrangement and not a program which would alter the amortization schedule of her loan.  However, as a result of her request, she was referred by LoanCare to Paymap which contacted Plaintiff on LoanCare's

2

behalf in December 2014.   Unbeknownst to Plaintiff, LoanCare and Paymap had arranged to market an Equity Accelerator Program ("EAP") to any borrower requesting a bi-weekly payment plan.   The EAP was represented and marketed as the "LoanCare Equity Accelerator Program" and the communications were tailored to give the impression that the program was operated through LoanCare.   However, in reality, the EAP was managed by Paymap, a separate entity, and payments were actually directed to Paymap and then to LoanCare to apply to the loan.   In any event, the EAP was a way to generate fees for both LoanCare and EAP and was marketed to borrowers as a way to generate savings over the course of the loan and to pay the loan off early.   In reality, any savings achieved through bi-monthly payments could be achieved without the EAP or any other "program", simply by making regular bi-monthly payments.

7.     After making her initial request to make bi-monthly payments, Plaintiff was contacted by phone and email marketing the EAP by persons she believed were representing LoanCare about a program offered by LoanCare.   In fact, the emails introducing the EAP labeled the program "the "LoanCare Equity Accelerator Program."   Correspondence later sent to Plaintiff included the same description.   Also, the introductory solicitation emails included the following description: "The Equity Accelerator program is *offered by LoanCare* under an agreement with Paymap Inc. *We provided certain information about you and your mortgage to Paymap so Paymap could assist us in offering the program to you."*   (Emphasis added).   On the marketing call, the sales representative explained that Plaintiff's payments would be made bi-monthly through LoanCare's program and, through the EAP, LoanCare would automatically deduct partial payments every two weeks and use those funds to timely apply a full payment each month.   It was explained that because she would make more than two payments in some months, the program would allow her to pay her mortgage balance ahead between 6 to 7 years earlier than scheduled. It was made clear to Plaintiff that the money would be deducted from her account by LoanCare

3

and would be directly applied to her mortgage so that she would not only remain current, but also make extra payments towards principle.

8.      Paymap's involvement was the result of a referral and marketing arrangement between Paymap and LoanCare where by any borrower's request for bi-monthly payments would be referred to Paymap so that it could place the borrower in its Equity Accelerator Program. The fact that payments were not deducted by LoanCare and were in fact directed to a third party was obscured. As stated, correspondence and emails sent to Plaintiff regarding the EAP was addressed from "LoanCare Servicing – Equity Accelerator Processing Center."   Also, the introductory solicitation emails stated that LoanCare would "initiate transfers from [borrower's] designated account to make monthly payments to [borrower's] mortgage…." and that LoanCare "will make [borrower's] monthly payment beginning the month after withdrawals have begun from [borrower's] designated bank account."  In fact, the automatic withdrawals from Plaintiff's bank account were listed as "EFT – LoanCare/MTG PYMENT."

9.      In reliance upon the representations made about the EAP and believing, based on those representations, that timely payments would be withdrawn by LoanCare and timely applied to her mortgage by LoanCare, Plaintiff agreed to have her payments deducted bi-monthly through LoanCare's EAP.  These representations included the assurance that the payments would be timely applied to her mortgage loan and she would remain current.  There was a $295.00 enrollment fee and a $2.50 monthly fee to make the payments, but the representative assured her that she would save many times that amount through the LoanCare EAP.

10.     In August 2015, LoanCare's subservicing role ended with respect to Plaintiff's loan and servicing of the loan was performed exclusively by TMS.  After the servicing change, her payments continued to be automatically deducted from her account each month.  However, by February 2016, TMS had indicated in its mortgage statement that it had not received the January

payment. Plaintiff contacted LoanCare and TMS on or about February 1, 2016 about the missing January payment and explained that funds for the payment were withdrawn from her account. Plaintiff was assured that the payment was misdirected by mistake and that the problem would soon be rectified. However, by the end of February, the problem was not resolved and TMS continued to consider the loan due for the January payment.

11.     In the meantime, funds for the February and March 2016 payments were electronically withdrawn from Plaintiff's bank account and timely applied to her loan. However, because the January payment was never applied, the loan remained 30 days in arrears. Funds were likewise electronically withdrawn from Plaintiff's account for the April payment, but no payment was applied for that month. As a result, TMS considered the loan two months in arrears.

12.     Again, Plaintiff contacted TMS and LoanCare in an attempt to rectify the situation. In so doing, Plaintiff provided confirmation that the funds for the missing payments deducted from her account. In her attempt to rectify the situation, it was eventually explained to her that, even though her bank records showed that the payments were being withdrawn by her mortgage company, the funds were actually directed to Paymap, a separate entity that manages the EAP, and that the failure to timely deliver the funds so that they could be applied to the mortgage resulted from Paymap's failure to direct the payment to the property entity.

13.     As a result of the failure to direct the payments so that they would be properly applied to the mortgage payment, Plaintiff has been subjected to collection efforts by TMS that include severe credit impairment, threats of imminent foreclosure and an unrelenting barrage of collection phone calls that continued throughout 2016 and 2017. Such failure to properly direct the funds also resulted in the payment of excess fees and interest.

## COUNT I
### (FRAUD)

14.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

15.     Defendant made several misrepresentations of material fact regarding the Equity Accelerator Program to the Plaintiff, including but not limited to the following:

    a.  That payments deducted from her bank account would be timely applied to Plaintiff's loan so that she would not only be current, but would pay additional amounts which would be applied to her principal balance;

    b.  That the automatic withdrawals of funds intended for Plaintiff's mortgage payments were withdrawn by LoanCare and paid directly to LoanCare through a program operated by LoanCare; and

    c.  That payments made through the Equity Accelerator Program would save Plaintiff money by paying down the principal balance sooner than the original amortization schedule.

16.     The above misrepresentations were made to Plaintiff over the phone during the solicitation call referenced above and in emails and correspondence describing the EAP as alleged above.  The misrepresentations were also made in the notations Defendant caused to appear in Plaintiff's bank statements indicating that the payments were being withdrawn by and directed to the mortgage company.

17.     The above misrepresentations were false when made and Defendant knew them to be false when they were made.  The misrepresentations were made willfully to deceive, or recklessly without knowledge or were made innocently by mistake.   In any case, the misrepresentations were relied upon by the Plaintiff to her detriment.

18.     These misrepresentations were made verbally and in writing as alleged above.

19.     These misrepresentations were part of a pattern and practice of deception and misinformation directed to borrowers in order to solicit participation in the EAP and thus generate additional fees.  Said misrepresentations were intended, *inter alia*, provide borrowers the false belief that withdrawals were being directed by LoanCare and paid directly to LoanCare.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant for fraud and award Plaintiff compensatory damages, including damages for mental anguish and emotional distress; and punitive damages, plus interest and costs.  Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT II
### (MONEY HAD AND RECEIVED)

20.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

21.     Funds withdrawn from the Plaintiff's bank account identified as funds to be timely applied to the Plaintiff's mortgage, including the payments due for January and April 2016, constitute funds which, by law and in equity, should have been paid to satisfy Plaintiff's mortgage obligations for the months identified.  Instead, those funds were directed to Defendant and have been retained or misdirected by Defendant and, in any event have not been used to satisfy the loan obligations.

22.     Plaintiff has demanded that said funds be applied as identified, but Defendant has refused or failed to do so.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant in the for damages proximately resulting from the unlawful acts of the Defendant, plus interest and costs. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT III
## (CONVERSION)

23.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

24.     As alleged above, funds held in Plaintiff's bank account were identified as funds to be directed to her mortgage company for timely application and satisfaction of her monthly obligations.  Said funds are the Plaintiff's property and were identified for a specific purpose. Defendant has wrongfully converted and exercised dominion and control over said funds, including the funds identified as payments due for January and April 2016.  As a result, said funds have never been applied as identified and Plaintiff has suffered damage as a proximate result thereof.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant in the for damages proximately resulting from the Defendant's conversion of Plaintiff's property, plus punitive damages, interest and costs.  Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT IV
## (WANTONNESS)

25.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

26.     The acts and omissions alleged herein by Defendant constitute wantonness and were made with a wanton, reckless or conscious disregard for the Plaintiff's rights and welfare.

27.     Plaintiff has suffered damage as a proximate result of the said wantonness.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant for wantonness and award her compensatory damages, including damages for mental anguish and

emotional distress; and punitive damages, plus interest and costs.  Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT V
### (NEGLIGENCE)

28.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

29.     The acts and omissions alleged herein by Defendant constitute negligence.

30.     Plaintiff has suffered damage as a proximate result of the said negligence.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant for negligence and award her compensatory damages, including damages for mental anguish and emotional distress, plus interest and costs.  Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

**PLAINTIFF SEEKS RELIEF IN EXCESS OF $75,000.00.**

**PLAINTIFF REQUESTS TRIAL BY JURY AS TO ALL CLAIMS.**

KENNETH J. RIEMER (RIEMK8712)
JAMES D. PATTERSON (PATTJ6485)
UNDERWOOD & RIEMER, P.C.
*Attorneys for Plaintiff*
166 Government Street, Suite 100
Mobile, Alabama 36602
Telephone: (251) 432-9212
Email: kjr@alaconsumerlaw.com
Email: jpatterson@alalaw.com

**DEFENDANT IS TO BE SERVED BY CERTIFIED MAIL AT THE FOLLOWING ADDRESS:**

Paymap, Inc.
12500 East Belford Avenue
Englewood, CO 80112

Paymap
c/o The Corporation Company
7700 East Arapahoe Road, Suite 220
Centennial, CO 80112-8268